**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONALD PALMER, JR.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | **3:20-CV-1084** |
| | : | **(JUDGE MARIANI)** |
| **BLACK & DECKER (U.S.) INC,** | : | |
| **d/b/a DEWALT INDUSTRIAL** | : | |
| **TOOL COMPANY, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM OPINION</u>

### I. INTRODUCTION

The above-captioned action was filed on December 23, 2019 (Doc. 1) in the United States District Court for the Eastern District of Pennsylvania.  In June 2020, the action was transferred to the United States District Court for the Middle District of Pennsylvania.  The Complaint arises out of Plaintiff's slip-and-fall on ice in January of 2018 while wearing a DeWalt heated jacket.  Plaintiff, Donald Palmer, Jr., asserts claims against Defendants Black & Decker (U.S.) Inc. d/b/a DeWalt Industrial Tool Company and Stanley Black & Decker, Inc. d/b/a Mac Tools for Strict Liability (Counts 1, 2), Breach of Warranty (Counts 3, 4), and Negligence (Counts 5, 6).

Trial in this matter is scheduled to commence on June 6, 2022.

Presently before the Court is Defendants' Motion in Limine to Deem Government and Industry Standards Admissible.  (Doc. 59).

## II. STANDARD OF REVIEW

"The purpose of a motion in limine is to allow the trial court to rule in advance of trial

on the admissibility and relevance of certain forecasted evidence." *United States v.*

*Tartaglione*, 228 F.Supp.3d 402, 406 (E.D. Pa. 2017).  A court may exercise its discretion to

rule in limine on evidentiary issues "in appropriate cases."  *In re Japanese Elec. Prods.*

*Antitrust Litig.*, 723 F.2d 238, 260 (3d Cir. 1983), *rev'd on other grounds sub nom.*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  Nevertheless, a

"trial court should exclude evidence on a motion in limine only when the evidence is clearly

inadmissible on all potential grounds." *Tartaglione*, 228 F.Supp.3d at 406.

Further, while motions in limine may serve as a useful pretrial tool that enables more

in-depth briefing than would be available at trial, a court may defer ruling on such motions "if

the context of trial would provide clarity." *Frintner v. TruePosition*, 892 F.Supp.2d 699, 707

(E.D. Pa. 2012).  Indeed, "motions in limine often present issues for which final decision is

best reserved for a specific trial situation." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506,

518 n.10 (3d Cir. 1937).  Thus, certain motions, "especially ones that encompass broad

classes of evidence, should generally be deferred until trial to allow for the resolution of

questions of foundation, relevancy, and potential prejudice in proper context." *Leonard v.*

*Stemtech Health Scis., Inc.*, 981 F.Supp.2d 273, 276 (D. Del. 2013).  *See also*,

*Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (2008) ("Relevance and

prejudice under Rules 401 and 403 are determined in the context of the facts and

arguments in a particular case, and thus are generally not amenable to broad *per se* rules."). Moreover, "*pretrial* Rule 403 exclusions should rarely be granted. . . . [A] court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 859 (3d Cir. 1990) (emphasis in original).

Finally, it is important to note that "in limine rulings are not binding on the trial judge, and the judge may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).

### III. ANALYSIS

Defendants' Motion in Limine to Deem Government and Industry Standards Admissible (Doc. 59) argues that government and industry standards are "relevant and admissible" in this case under current Pennsylvania law where Plaintiff has asserted both negligence and strict liability claims. Defendants further assert that the report of Plaintiff's expert, James Glancey "is based entirely on industry standards", and thus, at minimum, "opens the door" regarding the admissibility of industry standards. (*Id*. at ¶¶ 9, 28).

Because Plaintiff informed the Court and opposing counsel at the pre-trial conference on May 26, 2022 that he intended to withdraw the negligence claims in this

3

action, the Court only addresses the admissibility of government and industry standards

with respect to Plaintiff's strict liability claims.[1]

To put the issue in context, *Azzarello v. Black Bros. Co., Inc.*, 391 A.2d 1020 (Pa.

1978), which drew a strict line between negligence and strict liability, provided the

---

[1] At the pre-trial conference, Defendants' counsel stated, for the first time, that he believed evidence of government and industry standards was also relevant and admissible because Plaintiff has alleged claims for breach of warranty. The Court declines to address that argument herein as it was not raised in Defendants' motion or accompanying brief, and Defendants have failed to offer legal support for this position. At the pre-trial conference, the Court ordered Defendants' counsel to submit legal authority for his assertion. As of the date of this Memorandum Opinion, Defendants have failed to do so. At best, Defendants' trial brief cites to *Sullivan v. Werner Co.*, 253 A.3d 730 (Pa. Super. 2021), and its quotation therein of a statement from *Webb v. Volvo Cars of North America*, 148 A.3d 473 (Pa. Super. Ct. 2016) that "Post-*Tincher*, parties must tailor their pleadings, discovery, and trial strategy to one or both of the new theories of liability. We believe the continued vitality of the prohibition on government and industry standards evidence is a question best addressed in a post-*Tincher* case." (*See* Doc. 109, at 12). To the extent that Defendants believe that their citation to *Sullivan*, and their reasoning that "the *Sullivan* court meant that in order for a plaintiff to keep out industry or government standards, they had to narrowly tailor their pleadings to exclude any cause of action in which industry standards are indeed admissible, like negligence or breach of warranty" (Doc. 109, at 12), is sufficient to support their position that government and industry standards are categorically admissible in a breach of warranty case, they are incorrect. The *Sullivan* court did recognize that *Tincher* found that the "separation between negligence and strict products liability neither reflected the realities of practice nor served the interests of justice". *Sullivan*, 253 A.3d at 741-742. However, *Sullivan* continued:

> While it recognized that negligence principles are part of products liability law, *Tincher* made clear that it did not mean that those tort principles were paramount. In examining the historical development of products liability law, *Tincher* emphasized significant ways in which products liability law in tort differed from other negligence-based causes of action. *Tincher*, 104 A.3d at 357. It went on to note that products liability law was also underpinned by contract warranty law, which never had anything to do with negligence principles. *Id.* at 357 ("Redress for injury caused by products was available in tort ... or by asserting breach of warranty claims.").

*Id.* at 742. Defendants' assertion that *Sullivan* somehow stands for the proposition that a breach of warranty claim constitutes a "cause of action in which industry standards are indeed admissible", is without foundation. Although this Court is not ruling on the admissibility of evidence of government or industry standards with respect to Plaintiff's breach of warranty claims, as this issue was not raised in Defendants' motion *in limine* or supporting brief, the Court notes only herein that, at this time, Defendants have not provided the Court with any persuasive legal authority supporting an argument that this evidence is admissible as to the breach of warranty claim.

4

foundation for the development of the rule precluding evidence of a product's compliance

with government standards as "irrelevant and inadmissible in a strict products liability action

under section 402A of the Restatement (Second) of Torts." *Webb v. Volvo Cars of North

America*, 148 A.3d 473, 480-481 (Pa. Super. Ct. 2016).  The rule, developed in *Lewis v.

Coffing Hoist Division, Duff-Norton Company, Inc.*, 528 A.2d 590 (Pa. 1987), and *Gaudio v.

Ford Motor Co.*, 976 A.2d 524 (Pa. Super. Ct. 2009), with reliance on *Azzarello*, was not in

dispute until the Pennsylvania Supreme Court decided *Tincher v. Omega Flex, Inc.*, 104

A.3d 328 (Pa. 2014), and overruled *Azzarello*.  *Tincher* confirmed that Pennsylvania

continued to follow section 402A of the Restatement (Second) of Torts,[2] but the overruling

---

[2] Section 402A of Restatement (Second) of Torts is titled "Special Liability of Seller of Product for Physical Harm to User or Consumer."  It provides the following:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>> (a) the seller is engaged in the business of selling such a product, and
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965).

of *Azzarello* and other aspects of the decision cast doubt on the rule that evidence showing

compliance with government and industry standards was inadmissible.[3]

As a threshold matter, it is undisputed that Pennsylvania law applies in this diversity

action.[4]  However, the parties disagree as to admissibility of the evidence at issue under

Pennsylvania strict liability law.

_____

[3] *Tincher* specifically held the following:

1. This Court's decision in *Azzarello v. Black Brothers Company* [480 Pa. 547], 391 A.2d 1020 (Pa. 1978) is hereby overruled.

2. Having considered the common law of Pennsylvania, the provenance of the strict product liability cause of action, the interests and the policy which the strict liability cause of action vindicates, and alternative standards of proof utilized in sister jurisdictions, we conclude that a plaintiff pursuing a cause upon a theory of strict liability in tort must prove that the product is in a "defective condition." The plaintiff may prove defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer, or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. The burden of production and persuasion is by a preponderance of the evidence.

3. Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue. Thus, the trial court is relegated to its traditional role of determining issues of law, *e.g.*, on dispositive motions, and articulating the law for the jury, premised upon the governing legal theory, the facts adduced at trial and relevant advocacy by the parties.

4. To the extent relevant here, we decline to adopt the Restatement (Third) of Torts: Products Liability §§ 1 *et seq.*, albeit appreciation of certain principles contained in that Restatement has certainly informed our consideration of the proper approach to strict liability in Pennsylvania in the post-*Azzarello* paradigm.

*Tincher*, 104 A.3d at 335.

[4] Related to the matter at issue here, the Third Circuit Court of Appeals noted that admission of evidence related to "trade custom" or "reasonable care" had no place in suits brought under § 402A "as that section has been interpreted by the Pennsylvania courts."  *Holloway v. J.B. Systems, Ltd.*, 609 F.2d 1069, 1073 (3d Cir. 1979) (citing *Azzarello v. Black Bros. Co., Inc.*, 391 A.2d 1020 (Pa. 1978)).  By extension, this

Because this is a diversity action and the Court must apply Pennsylvania law, the Court must determine the current state of Pennsylvania law on the issue of admissibility of evidence of compliance with government/industry standards in a strict products liability case, evidence which was clearly inadmissible before *Tincher*. The Pennsylvania Supreme Court has not spoken on the issue since *Tincher*. Thus, the issue continues to present a question of Pennsylvania law not addressed by the Supreme Court of Pennsylvania and this Court's task is to predict how that court would rule. *See, e.g.*, *Pa. Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir. 1981). "The policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts may also inform our analysis." *Id*. *See also*, *State Farm Mut. Auto. Ins. Co. v. Rosenthal*, 484 F.3d 251, 253 (3d Cir. 2007).

In *Webb v. Volvo Cars of North America, LLC*, the Pennsylvania Superior Court found that the trial court "plainly erred in permitting the jury to consider" evidence of government standards in connection with strict product liability claims, explaining that "[e]vidence of a product's compliance with government standards is irrelevant and inadmissible in a strict products liability action under section 402A of the Restatement (Second) of Torts." *Webb*, 148 A.3d at 480. However, post-*Webb* decisions do not consistently read *Webb* to mean that such evidence is categorically inadmissible. The

---

statement acknowledges that Pennsylvania law applies to the admission of evidence related to government/industry standards introduced in the context of a § 402A claim.

7

questions arise because the *Webb* holding was based, in part, on the fact that *Tincher* had

not been decided when the question arose at the trial court level, and, as discussed below,

*Webb* raised questions about the application of the rule post-*Tincher*.  *See id.* at 483.

Webb examined the issue of the admissibility of government/ industry standards

beginning with the origins of the government/industry standard rule in *Lewis v. Coffing Hoist*

*Division, Duff-Norton Co.*, 528 A.2d 590 (Pa. 1987) and *Gaudio v. Ford Motor Co.*, 976 A.2d

524, 543 (Pa. Super. Ct. 2009)).  *Webb*, 148 A.3d at 480-481.  *Webb* explained that *Gaudio*

relied on *Lewis* in holding that evidence of a product's compliance with government

standards is irrelevant and inadmissible in a strict products liability action under section

402A of the Restatement (Second) of Torts, and *Lewis* had relied on *Azzarello* for the

proposition that negligence concepts have no place in a case based on strict liability.  *Id.*

(citations and quotations omitted).  *Webb* also noted that the *Lewis* court had reasoned that:

> evidence of industry standards in a defective design case "go to the
> reasonableness of the [manufacturer's] conduct in making its design choice."
> *Id.* at 594. "[S]uch evidence would have created a strong likelihood of diverting
> the jury's attention from the [product] to the reasonableness of the
> [manufacturer's] conduct in choosing its design." *Id.*
>
> . . . .
>
> . . . *Lewis* also cited with approval to *Lenhardt v. Ford Motor Co.*, . . .  683 P.2d
> 1097 (1984): "The *Lenhardt* Court also observed that if a manufacturer's
> product has design attributes which make it unsafe for its intended use, there
> is no relevance in the fact that such a design is widespread in the industry." *Id.*
> at 594.

*Webb*, 148 A.3d at 480-481.

The Court in *Webb*, after discussing the fact that *Tincher* specifically overruled

*Azzarello* and cited *Lewis* and *Gaudio* but did not overrule either case, next considered

*Tincher's* impact on the prohibition of industry or government standards evidence in a strict

liability design defect case, i.e., whether "*Tincher*, by implication, overruled the prohibition."

*Id.* at 481.  Summarizing that *Azzarello's* strict prohibition on introducing negligence

concepts into strict liability claims was no longer the law in Pennsylvania, and *Lewis* and

*Gaudio* relied primarily on *Azzarello*, *Webb* acknowledged that the firm division between

negligence and strict liability no longer existed.  It declined, however, to decide the

government/industry standard question based on the prevailing pre-*Tincher* precedent at

the time the trial court considered the issue and its conclusion that the overruling of

*Azzarello* did not provide a sufficient basis for disregarding the evidentiary rule expressed in

*Lewis* and *Gaudio*.[5]  *Id.* at 483.  The Superior Court further discussed the issue as follows:

> While it is clear after *Tincher* that the firm division between strict liability and negligence concepts no longer exists, it is not clear that the prohibition on evidence of government or industry standards no longer applies. *Lewis*, in particular, noted that a defective design could be widespread in an industry. *Lewis*, 528 A.2d at 594. The *Tincher* opinion does not undermine that rationale for excluding governmental or industry standards evidence. Furthermore, *Tincher* expressed two theories of strict products liability – consumer expectations and risk-utility. It is possible that government/industry standards evidence could be admissible under both theories, one and not the other, or neither. It is also possible that the admissibility of such evidence will depend upon the circumstances of a case. The *Tincher* Court noted the possibility of shifting the burden of production and persuasion to the defendant under the risk-utility theory. This burden shift, if it becomes law, may provide defendants

---

[5] Judgment was entered at the trial court level on March 26, 2014, 148 A.3d at 476, and *Tincher* was decided on November 19, 2014, 104 A.3d 328.

9

a basis to advocate for the admissibility of government or industry standards evidence in risk-utility cases.

These contingencies illustrate that *Tincher* will affect every stage of future products liability cases. Post-*Tincher*, parties must tailor their pleadings, discovery, and trial strategy to one or both of the new theories of liability. **We believe the continued vitality of the prohibition on government and industry standards evidence is a question best addressed in a post-*Tincher* case.**

*Webb*, 148 A.3d at 483 (emphasis added).

In the *Webb* analysis, the Superior Court did not specifically recognize *Tincher's*

discussion of "related legal issues" where the Court stated

[w]e recognize – and the bench and bar should recognize – that the decision to overrule *Azzarello* and articulate a standard of proof premised upon alternative tests in relation to claims of a product defective in design may have an impact upon other foundational issues regarding manufacturing or warning claims, and upon subsidiary issues constructed from *Azzarello,* such as the availability of negligence-derived defenses, bystander compensation, or the proper application of the intended use doctrine. *Accord Bugosh* [*v. I.U. North Am., Inc.,* 971 A.2d 1228, 1244-45 & 1248-49 (3d Cir. 2009)]. These considerations and effects are outside the scope of the facts of this dispute and, understandably, have not been briefed by the Tinchers or Omega Flex.

This Opinion does not purport to either approve or disapprove prior decisional law, or available alternatives suggested by commentators or the Restatements, relating to foundational or subsidiary considerations and consequences of our explicit holdings. In light of our prior discussion, the difficulties that justify our restraint should be readily apparent. The common law regarding these related considerations should develop within the proper factual contexts against the background of targeted advocacy.

*Tincher*, 104 A.3d at 409-410.

The foregoing discussions found in *Tincher* and *Webb* indicate a recognition that,

post-*Tincher, Azzarello*-based decisions such as *Lewis* and *Gaudio* would continue to be

the subject of debate and uncertainty.  Although *Webb* concluded that "the continued vitality

of the prohibition on government and industry standards evidence is a question best

addressed in a post-*Tincher* case," 148 A.3d at 483, the state Supreme Court has not found

an opportunity to directly address or decide the issue since then.

The Pennsylvania Superior Court did discuss the issue of the admissibility of

government/industry standards in *Dunlap v. Federal Signal Corp.*, 194 A.3d 1067 (Pa.

Super. Ct. 2018).[6]  In the split decision, the *Dunlap* majority reiterated *Webb's* conclusion

that "the overruling of *Azzarello* did not provide a sufficient basis to disregard the evidentiary

rule espoused in *Lewis* . . . and *Gaudio*" and relied on *Webb* for the proposition "that *Tincher*

did not undermine the concern, identified in *Lewis*, that defective design could be

widespread in the industry, and hence, evidence that a product comported with industry

standards was not proof of non-defectiveness."  194 A.3d at 1072.  Following these

statements, the majority specifically noted that "[t]he continued viability of the evidentiary

rule espoused in *Lewis* and *Gaudio* is not before us."  194 A.3d at 1072 n.8.  The majority

further noted that the Superior Court's 2017 decision in *Renninger v. A&R Mach. Shop*, 163

A.3d 988 (Pa. Super. 2017) had not reached the issue although the question had been

presented whether the trial court had erred in allowing evidence of industry standards based

---

[6]  *Dunlap* considered *Tincher's* application to the plaintiffs' argument that proof that their alternative
design comported with industry standards was enough to prove its effectiveness for all users, an argument
which had been raised before the trial court on a motion for reconsideration.  194 A.3d at 1072-1073.  The
trial court had determined that "compliance with industry standards alone was not *prima facie* evidence that
a product's design was non-defective and effective, and held that expert opinion was necessary to establish
that the proposed alternative design was effective and met the need of all users."  *Id.* at 1073.

on the reasoning that "industry standards may supply the jury with a useful starting place from which to evaluate the . . . design." *Id.*

Despite the *Dunlap* majority's pronouncement that it had not considered the viability of the evidentiary rule, Judge Lazarus's dissent in *Dunlap* begins with the statement "I am constrained to disagree with the learned Majority's conclusion that this Court's decision in *Webb* definitively reestablished a bright line evidentiary rule barring evidence of a product's compliance with governmental and/or industry standards."  194 A.3d at 1073-1074.  Judge Lazarus stated that he believed "the question of whether governmental/industry standard evidence is admissible in *some* products liability cases post-*Tincher* remains mostly unanswered."  *Id.* at 1075.  He then set out useful guidance on the matter of admissibility:

> It remains, though, that paramount to strict product liability theory, as *Lewis* and *Gaudio* suggest, is the understanding that liability attaches regardless of the reasonableness of a manufacturer's actions even if the defendant exercised all possible due care. *See* Restatement (Second) of Torts § 402A. Accordingly, to prove a strict products liability claim, a plaintiff need only show that a seller (i.e., a manufacturer or distributor) placed in the market a product in a defective condition. Post-*Tincher* analysis should focus on the product itself rather than the reasonableness of the manufacturing, design, or distribution the product. Therefore, I agree that nothing in *Tincher*, as recognized by *Webb*, necessarily allows factfinders to consider governmental or industry standard evidence as dispositive in strict liability cases.
>
> Even so, a *plaintiff* in a strict product liability action, like [the plaintiffs] here, may open the door to the introduction by a defendant of evidence of compliance with industry or governmental standards if a plaintiff introduces witness testimony regarding such standards during direct or cross-examination. [The plaintiffs] may be willing to assume this risk, but to the extent that a plaintiff introduces governmental/industry standard evidence, the opening so created should be reasonably related in scope to the substance of the offending testimony. *See Gaudio*, 976 A.2d at 544.

Here, [the plaintiffs], *not* [the defendant], proffered through [their expert's] testimony regarding industry standards for sirens, but only to show their alternative design was effective. As proffered, such evidence does not: (1) draw our attention to the reasonableness of [the defendant's] conduct in choosing its design; or (2) suggest defective designs are widespread in the siren industry. Rather, it purportedly proves that a different design that comports with siren industry standards is still effective.

In sum, I do not believe this Court's decision in *Webb* stands for the broad holding the Majority characterizes in its opinion. The *Webb* Court, multiple times, expressly states that the question of whether governmental or industry standard evidence is admissible in strict products liability cases remains open. *See generally Webb*, 148 A.3d at 483.

*Dunlap*, 194 A.3d at 1075-1076.

Importantly, the *Dunlap* majority agreed with Judge Lazarus in part:

We do not disagree with the learned Dissent that this Court posited in *Webb* . . . that the evidentiary rule prohibiting admission of industry standards might be re-examined post-*Tincher*. Nonetheless, in *Webb*, this Court reasoned that *Tincher* did not abrogate the accepted notion that defective design can be widespread in an industry, and that compliance with industry standards is not proof of non-defectiveness.

*Id.* at 1072 n.7.

Most recently, the Superior Court addressed whether a trial court erred in granting a motion *in limine* by Plaintiff seeking to bar the admission of any government or industry standards at trial where Plaintiff argued that Pennsylvania courts have generally barred such evidence in a strict liability case and that this prohibition was unaffected by *Tincher*. *Sullivan v. Werner Co.*, 253 A.3d 730, 737 (Pa. Super. 2021). Having surveilled the applicable case law, the Superior Court first recognized that, prior to *Tincher*, "[t]ogether,

*Lewis* and *Gaudio* established a clear prohibition against industry and government

standards in strict product's liability." *Id*. at 741.  The Court thus turned to the question of

"what impact *Tincher* had when it expressly overruled *Azzarello* and the strict division of

negligence and strict liability." *Id*.  The Court acknowledged that "[i]n the years after *Webb*,

this Court has had little opportunity to readdress whether the *Lewis/Gaudio* evidentiary

prohibition remained good law." *Sullivan*, 253 A.3d at 744.

The Superior Court thereafter made a number of observations in determining the

impact of *Tincher* on the admissibility of evidence of government/industry standards in a

strict liability case:

> . . . [N]otwithstanding suggested interpretations of *Tincher* that would make
> products liability law negligence-based on the due care of the manufacturer in
> designing or manufacturing the product, strict liability is still the standard to be
> used in determining whether a product is "unreasonably dangerous" in
> Pennsylvania. Under the RESTATEMENT (SECOND) § 402A formulation, a
> product can be designed and manufactured with "all possible care" but still be
> defective. Manufacturer liability then depends on the product's dangers, not on
> the reasonableness of the manufacturer's conduct in designing or
> manufacturing the product.
>
> Under the Section 402A standard, knowledge of the product's danger is
> imputed to the manufacturer in the design and manufacturing of the product no
> matter how foreseeable the defect was or how reasonable its conduct in the
> design and manufacture. If imputation of knowledge of the danger to the
> manufacturer is eliminated by the standard as to whether the manufacturer
> could have reasonably foreseen the risks of the product, that has the same
> effect as eliminating liability without negligence on the part of the manufacturer.
> In other words, strict liability would be eliminated, something that *Tincher* did
> not do.
>
> Reasonableness or foreseeability may be taken into consideration in other
> aspects of liability such as "negligence-derived defenses, bystander

compensation, or the proper application of the intended use doctrine." *Tincher* at 409. Generally, those concepts may be used in determining whether, in light of its inherent dangers, the product fails to satisfy either discernable consumer expectations of safety or a risk/utility analysis. Negligence principles are not used in determining whether the manufacturer exercised due care in the design and manufacture of the product.

Second, the Supreme Court's decision in *Tincher* to overrule *Azzarello* did cast some doubt on the *Lewis/Gaudio* evidentiary prohibition against government and industry standards evidence in strict liability actions. However, *Tincher* does not cast any more doubt on that principle than any other decision issued while *Azzarello* was extant. *Tincher* foresaw that its holding could impact subsidiary issues derived from *Azzarello*. It advised, "[t]he common law regarding these related considerations should develop within the proper factual contexts against the background of targeted advocacy." *Tincher*, 104 A.3d at 409. Following *Tincher*, however, no Pennsylvania court has held that *Tincher*, in overruling the *Azzarello* paradigm, has implicitly overruled *Lewis/Gaudio* just because our Supreme Court disavowed the strict separation of negligence concepts from strict products liability law.

A final and important observation. In *Tincher,* after overruling *Azzarello,* our Supreme Court remanded the case to the trial court with instructions to reconsider the post-trial motions pursuant to Section 402A of the RESTATEMENT (SECOND) OF TORTS. *Tincher* at 136. In other words, in addressing issues involving products liability, our touchstone is Section 402A. RESTATEMENT (SECOND) OF TORTS § 402A(2)(a) provides that strict liability is established, notwithstanding that [] "the seller has exercised all possible care in the preparation and sale of his product." Whether a manufacturer has complied with industry or government standards goes to whether it "exercised all possible care in preparation of product" in making the design choice, not on whether there was a design defect in the product itself.

Under the above-quoted provision of the RESTATEMENT (SECOND), it is irrelevant if a product is designed with all possible care, including whether it has complied with all industry and governmental standards, because the manufacturer is still liable if the product is unsafe.

*Sullivan*, 253 A.3d at 746-747.

With these considerations in mind, the Superior Court noted that "evidence of industry standards may be excluded because those standards do not go to the safety of the product itself but to the manufacturers' 'possible care in preparation of product,' which is irrelevant to whether a product is unsafe or strict liability is established." *Id*. The Court thus confirmed that *Tincher* "neither explicitly nor implicitly overrules the exclusion of industry standards in a products liability case. Moreover, . . . the language of RESTATEMENT (SECOND) OF TORTS § 402A(2)(a) provides sufficient reason to exclude such evidence." *Id.* at 747-748.

This long and winding road through the past and present state of the government/ industry standard admissibility issue shows the continuing efforts of the Courts to identify the scope of *Tincher*'s impact on this issue now before the Court. In light of *Sullivan*'s determination that *Tincher* did not overrule prior state law precedent excluding evidence of government/industry standards in a strict liability action, and to balance the concerns of proper adherence to precedent and Pennsylvania courts' subsequent consideration of the issue, this Court concludes that *Dunlap* presents an acceptable approach to the issue of admissibility presented with Defendants' motion.

In keeping with the agreement of both the majority and dissent in *Dunlap* that *Webb* recognized that *Tincher* did not abrogate the accepted notion that defective design can be widespread in an industry, and that compliance with industry standards is not proof of non-defectiveness, 194 A.3d at 1072 & n.7, 1075-1076, this Court concludes that evidence of

compliance with government/industry standards introduced to show proof of non-

defectiveness will not be admissible.

In keeping with *Webb's* recognition that after *Tincher* "it is not clear that the

prohibition on evidence of government or industry standards no longer applies," 148 A.3d at

483, and *Sullivan*'s determination that *Tincher* did not operate to overrule the exclusion of

such evidence in a products liability case, the Court agrees with the *Dunlap* dissent's

consideration of introduction of government/industry standard evidence by a plaintiff and his

conclusion that a defendant may respond when a plaintiff opens the door.  As set out above,

Judge Lazarus opined that

> A *plaintiff* in a strict product liability action . . . may open the door to the
> introduction by a defendant of evidence of compliance with industry or
> governmental standards if a plaintiff introduces witness testimony regarding
> such standards during direct or cross-examination. Plaintiffs may be willing to
> assume this risk, but to the extent that a plaintiff introduces
> governmental/industry standard evidence, the opening so created should be
> reasonably related in scope to the substance of the offending testimony.

194 A.3d at 1076.

In sum, the Court agrees that if Plaintiff Palmer introduces evidence of

government/industry standards, Defendants will be allowed to respond accordingly with

evidence of compliance with those standards.  If evidence of compliance with

government/industry standards is introduced, the jury will be instructed that compliance with

government/industry standards is not proof of non-defectiveness.  Thus, should Plaintiff

offer evidence of government/industry standards in support of his strict liability claim or

should such evidence be made use of by Plaintiff's expert, Defendants shall be permitted to offer evidence in rebuttal reasonably related in scope to Plaintiff's evidence on the issue.[7]

## IV. CONCLUSION

For the forgoing reasons, Defendants' Motion in Limine to Deem Government and Industry Standards Admissible (Doc. 59) will be denied without prejudice.  A separate Order follows.

Robert D. Mariani
United States District Judge

---

[7] Defendants' motion *in limine* argues that the report of Plaintiff's expert, James Glancey "is based entirely on industry standards", and this "opens the door" regarding the admissibility of industry standards. A determination of whether Dr. Glancey's testimony is sufficient to "open the door" and allow Defendants to introduce evidence of compliance with government/industry standards must await trial.  Following the conclusion of Dr. Glancey's testimony, Defendants may renew this argument if they deem appropriate.